# The Dietze Construction Group, Inc.
3859 Centerview Drive
Chantilly, Virginia 20151-3204
Phone: (703) 464-9800

## Subcontract Agreement

THIS SUBCONTRACT, made this 19TH Day of September 2003 by and between THE DIETZE CONSTRUCTION GROUP, INC. (hereinafter "Dietze") and PICO Industries Incorporated, 611 W. Ostend Street, Baltimore, Md. 21230, (hereinafter "Subcontractor").

### WITNESSETH:

WHEREAS, Dietze and Uptown Partners, LLC c/o Metropolis Development Co. LLC (hereinafter "Owner", which term shall cover all of the Owner's agents and representatives including as appropriate the Architect and any other person or entity to the extent the Contract Documents which are hereby incorporated by reference expressly give functions to such person or entity) have entered into a contract dated May 14, 2003 for the construction of Langston Lofts (hereinafter "Project"), according to the Contract Documents listed in Exhibit A attached hereto (hereinafter "Contract Documents") and available for Subcontractor's review; and

WHEREAS, Dietze desires to subcontract certain work specified in the Contract Documents, and Subcontractor desires to perform said work at the prices and upon the terms and conditions hereinafter expressed;

NOW THEREFORE, in consideration of the mutual agreements herein expressed, the parties do contract as follows:

1. <u>Subcontractor's Work</u>

   a. Subcontractor shall perform all work and shall furnish all supervision, labor, materials, plant, scaffolding, tools, equipment, supplies and all other things necessary for the construction and completion of the work described in Exhibit B and work incidental thereto, in strict accordance and full compliance with the terms of the Contract Documents (which are hereby incorporated by reference) and this Subcontract and to the satisfaction of Dietze and the Owner.

   b. In respect of work covered by this Subcontract, Subcontractor shall, except as otherwise provided herein, have all rights which Dietze has under the Contract Documents toward the Owner. Subcontractor shall assume all obligations, risks and responsibilities which Dietze has assumed towards the Owner in accordance with the Contract Documents. Subcontractor shall have the right to enforce its rights and remedies and to defend against claims against it by the Owner as provided in Article 11.

2. <u>Complete Agreement</u>

   This Subcontract contains the entire agreement between the parties hereto with respect to the matters covered herein. No other agreements, representations, warranties, or other matters, oral or written, shall be deemed to bind the parties hereto.

3. <u>Performance and Payment Bonds</u>

   a. Immediately upon receipt of this Subcontract, Subcontractor shall at the expense of N/A or SUB NAME furnish to Dietze performance and payment bonds in the form attached hereto (Exhibit C) from a surety acceptable to Dietze, each in the full amount of this Subcontract.

   DELETE THIS LINE or ☑ No bond required at Subcontract formation. Article 3.a. not applicable when box is checked and no bond indicated above.

   b. If Subcontractor has not been required to furnish bonds or if Dietze desires Subcontractor to provide additional bond coverage, Dietze may, at any time upon written request, instruct Subcontractor to provide within ten (10) days performance and payment bonds, in a form and from a surety acceptable to Dietze, in an amount up to the then current full value of this Subcontract. In this event, Dietze will reimburse Subcontractor for reasonable bond premium.

   c. The payment of any incremental increase in the cost of bonds arising as a result of changes in the work shall be the responsibility of Subcontractor and may be included as a part of Subcontractor's price quotation for proposed changes pursuant to Article 9.

4. <u>Payment</u>

   a. Dietze shall pay Subcontractor for performance of the work subject to additions and deductions by change order or other Subcontract provisions, the total sum of Seven Hundred Forty One Thousand Dollars ($741,000.00).

   b. Partial payments shall be due Subcontractor in the amount of 90% of the work in place, which work has been approved by Dietze and the Owner, and for which payment has been made to Dietze by the Owner. If the Contract Documents allow Dietze partial payments for on-site stored materials, partial payments shall also be due Subcontractor in the amount of 90% of materials stored on-site which have been approved by Dietze and the Owner and for which payment has been made to Dietze by the Owner. If the Contract Documents allow partial payment for materials stored off-site, such payments shall be made to Subcontractor in the amounts and under the standards set forth in the Contract Documents for off-site stored materials which have been approved by Dietze and the Owner but only after Dietze's receipt of payment therefore from the Owner. For the purpose of determining partial payments, Subcontractor shall submit a breakdown of the total Subcontract price (showing the amount included therein in each principal category of work) to Dietze for approval within ten days of the execution of this Subcontract. In the event Dietze disapproves said breakdown, Dietze shall establish a reasonable breakdown which shall serve as the basis for partial payments.

   c. Partial payments shall be due on or about the 10TH day of the month following receipt of payment from the Owner by Dietze as long as Subcontractor is in compliance with the terms of this Subcontract. No partial payment made under this Subcontract shall be considered an acceptance of the work, in whole or in part.

EXHIBIT

A

d. Subcontractor shall ensure that all lower-tier subcontractors and employees, at all times, are timely paid all amounts due in connection with the performance of this Subcontract. After the first partial payment hereunder, Dietze shall have the right to withhold any subsequent partial payments until Subcontractor submits evidence satisfactory to Dietze that all amounts owed in connection with performance of this Subcontract have been paid. Further, Subcontractor agrees that Dietze may pay ... [illegible] ... who have not been paid the monies due them in connection with this Subcontract whether or not a lien has been filed, unless Subcontractor, within 10 days of receipt of notice or such shorter period as Dietze ... [illegible] ... (i) demonstrates that such sums are not due and (ii) provides Dietze adequate security.

e. In the event Dietze pays or indemnifies any person in accordance with this Subcontract, Subcontractor shall immediately reimburse Dietze for the full cost thereof. Subcontractor shall, to the extent that Dietze has not recovered said amounts pursuant to withholding, pay said amounts to Dietze upon demand. Subcontractor shall also immediately reimburse Dietze for any amounts paid under Dietze's payment bond in connection with this Subcontract and indemnified by Dietze.

f. All material and work incorporated into the Project or for which partial payment has been made shall become the property of Dietze, or, if the Contract Documents so provide, the property of the Owner; however, this provision shall not relieve Subcontractor from the sole responsibility and liability for all work and materials upon which payments have been made until final acceptance thereof by the Owner.

g. Dietze may withhold amounts otherwise due under this Subcontract or any other agreement between the parties to cover Dietze's reasonable estimate of any costs or liability Dietze has incurred or may incur for which Subcontractor may be responsible under this Subcontract or any other agreement between the parties. For purposes of this paragraph 4.g, the phrase "any other agreement between the parties" shall be deemed to include any agreement between Subcontractor and Dietze or any joint venture or other entity in which Dietze has an ownership interest. Appropriate adjustments to withholdings shall be made when the exact amounts owed are determined.

h. Final payment, subject to withholdings permitted hereunder, shall not be due until after the last of the following to occur: after Subcontractor's work has been completed and approved by the Owner, the entire Project is complete, all final payment prerequisites under the Contract Documents have been satisfied, satisfactory proof of payment of all amounts owed by Subcontractor in connection with this Subcontract has been provided, Article 13. has been complied with, and Dietze has been paid in full for the entire Project.

i. Subcontractor shall cooperate fully with Dietze in securing payment to Dietze by the Owner including but not limited to providing such supporting documentation as the Owner or Dietze may require.

j. At any time all monies due Dietze from the Owner are not paid, Dietze shall, in its sole discretion, apportion the nonpayment equitably and reduce the payments otherwise due Subcontractor accordingly. Such reductions shall continue until Dietze is paid all monies due it, provided however, if the withholdings do not relate to Subcontractor's work, Subcontractor shall be paid in full when Dietze's right to recover from the Owner is finally determined or expires. Subcontractor acknowledges that this Article 4.j. establishes a reasonable time for payment.

k. Neither partial nor final payment shall constitute or imply acceptance of work or materials.

5. Subcontractor's Investigations and Representations

Subcontractor represents that it is fully qualified to perform this Subcontract, and acknowledges that, prior to the execution of this Subcontract, it has (a) by its own independent investigation ascertained (i) the work required by this Subcontract, (ii) the conditions involved in performing the work, and (iii) the obligations of this Subcontract and the Contract Documents; and (b) verified all information furnished by Dietze or others satisfying itself as to the correctness and accuracy of that information. Any failure by Subcontractor to investigate independently and become fully informed will not relieve Subcontractor from its responsibilities hereunder.

6. Subcontractor's Liability

a. Subcontractor hereby assumes the entire responsibility and liability for all work, supervision, labor and materials provided hereunder, whether or not erected in place, and for all plant, scaffolding, tools, equipment, supplies and other things provided by Subcontractor until final acceptance of work by the Owner. In the event of any loss, damage or destruction thereof from any cause, Subcontractor shall be liable therefore, and shall repair, rebuild and make good said loss, damage or destruction at Subcontractor's cost.

b. Subcontractor shall be liable to Dietze for all costs Dietze incurs as a result of Subcontractor's failure to perform this Subcontract in accordance with its terms. Subcontractor's failure to perform shall include the failure of its lower-tier subcontractors to perform. Subcontractor's liability shall include but not be limited to (1) Subcontractor's increased costs of performance, such as extended overhead and increased performance costs; (2) Dietze's increased costs of performance, damages and other delay costs payable by Dietze to the Owner; (3) warranty and rework costs; (4) liability to third parties; (5) excess reprocurement costs; (6) consultants' fees; and (7) attorneys' fees and related costs.

c. If any person (including employees of Subcontractor) suffers injury or death or any property is damaged, lost or destroyed, as a result, in whole or in part, of Subcontractor's acts or omissions, whether or not involving negligence of Subcontractor, his employees, agents or lower-tier subcontractors, Subcontractor assumes the liability therefore and shall indemnify and hold harmless therefrom the Owner and Dietze and their agents, servants, employees and sureties. With respect to any action involving Subcontractor's acts or omissions, (i) Subcontractor shall at its own expense defend Dietze and all other indemnified parties, and (ii) Subcontractor shall pay all costs and expenses, including attorneys' fees, of, and satisfy all judgments entered against, Dietze and all other indemnified parties. Nothing herein shall preclude Dietze from participating in any such defense. Subcontractor's assumption of liability herein is in addition to assumption of all liabilities on account of or in any way related to Subcontractor's work which Dietze has assumed under the Contract Documents or under agreements with third parties who may be affected by construction of the Project.

d. In the event that Subcontractor or any of its agents, employees, suppliers, or lower-tier subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items belonging to or under the control of Dietze, Subcontractor shall be liable to Dietze for any loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be due solely to the negligence of Dietze employees operating Dietze-owned or Dietze-leased equipment.

e. Subcontractor's assumption of liability is independent from, and not limited in any manner by, the Subcontractor's insurance coverage obtained pursuant to Article 7., or otherwise. All amounts owed by Subcontractor to Dietze as a result of the liability provisions of this Subcontract shall be paid upon demand.

f. Subcontractor's liability for Dietze's costs under this Article 6., and under Articles 4., 10., 14., 22., and 23. shall include a 10% markup on the costs set forth therein. This markup is not a penalty but is established as liquidated damages to compensate Dietze for its additional costs not readily ascertainable and/or to allow Dietze a reasonable profit on work which Dietze must perform as a result of Subcontractor's failure to perform properly.

g. The Subcontract price includes one hundred dollars ($100.00) as specific consideration for indemnification under this Subcontract.

7. **Subcontractor's Insurance**

a. Prior to commencing the work, Subcontractor shall procure, with Dietze, the Owner and such other parties as are required by Dietze and/or the Contract Documents as additional insured parties on a primary basis, and thereafter maintain, at its own expense, until expiration of Subcontractor's obligations under the Subcontract, insurance coverage from insurers acceptable to Dietze in such amounts and in such form as required by Exhibit E.

b. Subcontractor waives all rights of recovery against Dietze, the Owner, and such other parties as are required by Dietze and/or the Contract Documents, for losses within the scope of Subcontractor's insurance.

c. Upon request, Subcontractor shall provide Dietze with certified copies of insurance policies required by Article 7.a.

8. **Time of Performance**

a. Subcontractor will proceed with the work in a prompt and diligent manner, in accordance with Dietze's schedules as reasonably amended from time to time. Subcontractor shall be liable to Dietze for failure to adhere to Dietze's schedules including amendments even if such schedules differ from schedules set forth in the Contract Documents or the time of completion called for by the Contract Documents. TIME IS OF THE ESSENCE.

b. If requested by Dietze, Subcontractor shall submit detailed schedules for performance of the Subcontract, in a form acceptable to Dietze, which shall comply with all scheduling requirements of the Contract Documents and of paragraph a. above. Dietze may from time to time, at its sole discretion, direct Subcontractor to make reasonable modifications and revisions in such schedules.

c. Subcontractor will coordinate its work with the work of Dietze, other subcontractors, and the Owner's other contractors, if any, so no delays or interference will occur in completion of any part or the entire Project.

d. Subcontractor shall be entitled to additional compensation for compliance with schedule amendments or damages for delay only to the extent the Contract Documents entitle Dietze to damages or to a contract adjustment increasing the price or Guaranteed Maximum Cost of the contract between Dietze and Owner.

9. **Changes**

a. Dietze may, at any time, unilaterally or by agreement with Subcontractor, without notice to the sureties, make changes in the work covered by this Subcontract. Any unilateral order or agreement under this Article 9.a. shall be in writing. Subcontractor shall perform the work as changed without delay.

b. Subcontractor shall submit to Dietze any requests or claims for adjustment in the price, schedule or other provisions of the Subcontract for changes directed by the Owner, as a result of deficiencies or discrepancies in the Contract Documents, or for circumstances otherwise permitted by the Contract Documents. Dietze shall process said claims shall be submitted in writing by Subcontractor in time to allow Dietze to comply with the applicable provisions of the Contract Documents so as to protect the interest of Subcontractor and others including requests or claims in the manner provided by and according to the provisions of the Contract Documents. Further, each Subcontract adjustment Dietze. Subcontract adjustments shall be made only to the extent that Dietze is entitled to relief from or must grant relief to the Owner. Subcontractor's allocable share shall be determined by Dietze, shall be equal only to Subcontractor's allocable share of any adjustment in Dietze's contract with the Owner. Subcontractor's allocable share shall be determined by Dietze, after allowance of Dietze's normal overhead and profit on any recovery and Dietze's expense of recovery, by making a reasonable apportionment, if applicable, between Subcontractor, Dietze and other subcontractors or persons with interests in the adjustment. This paragraph shall also cover other equitable adjustments or other relief allowed by the Contract Documents.

c. Payment on account of pending changes made by the Owner shall be made only if Dietze receives such payment from the Owner for Subcontractor's changed work. Each payment to Subcontractor on account of pending change orders shall be equal to Subcontractor's allocable share of Dietze's payment from the Owner for the pending change as determined by Dietze. Amounts paid on account of pending changes are provisional and not an admission of liability and shall be repaid to Dietze on demand whenever Dietze determines there has been an overpayment.

d. For changes ordered by Dietze independent of the Owner or the Contract Documents, Subcontractor shall be entitled to equitable adjustment in the Subcontract price. If Subcontractor considers any action or inaction by Dietze other than a formal change order to be a change, it shall so notify Dietze within three (3) days of said action or inaction and seek a confirmation from Dietze. Failure to comply with said confirmation procedure shall constitute a waiver of the right to compensation for the action or inaction.

e. Subcontractor shall within seven (7) days of a Dietze request submit a reasonable price quotation for proposed changes. If Subcontractor does not and Dietze is required to submit a price quotation to the Owner which includes a proposed change to Subcontractor's work, Dietze shall use its best estimate of the proposed change as it affects the Subcontract in its quotation to the Owner, which estimate shall be the maximum equitable adjustment due to Subcontractor.

10. **Subcontractor's Failure to Perform**

a. If in the opinion of Dietze, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workers, adequate supervision or material of the proper quality, (2) fail in any material respect to prosecute the work according to Dietze's current schedule, (3) cause, by any action or omission, the stoppage or delay of or interference with the work of Dietze or of any other contractor or subcontractor, (4) fail to comply with any provision of this Subcontract or the Contract Documents, (5) make a general assignment for the benefit of its creditors, (6) have a receiver appointed, or (7) become insolvent, then, after serving three (3) days' written notice, unless the condition specified in such notice shall have been eliminated within such three (3) days, Dietze, at its option, without voiding the other provisions of this Subcontract and without notice to the sureties, may (i) take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to Dietze for the cost thereof, (ii) terminate for default Subcontractor's performance of all or a part of the Subcontract work, or (iii) obtain specific performance or interlocutory mandatory injunctive relief requiring performance of Subcontractor's obligations hereunder, it being agreed by Subcontractor that such relief may be necessary to avoid irreparable harm to Dietze and/or the Owner. In the event of termination for default, Dietze may, at its option, (a) enter on the premises and take possession, for the purpose of completing the work, of all materials and equipment of Subcontractor, (b) make assignment of any or all of Subcontractor's subcontracts, and/or (c) either itself or through others complete the work by whatever method Dietze may deem expedient. In case of termination for default, Subcontractor shall not be entitled to receive any further payment until the work shall be fully completed and accepted by the Owner and payment in full made by the Owner. At such time, if the unpaid balance of the price to be paid shall exceed the expense incurred by Dietze including overhead and profit, such excess shall be paid by Dietze to Subcontractor. If such amount shall exceed such unpaid balance, the Subcontractor shall pay Dietze the difference on demand.

b. If Dietze wrongfully exercises its option under Article 10.a.(i), that action shall be treated as a deductive change. If Dietze wrongfully exercises its option under Article 10.a.(ii), that termination for default shall be considered a termination for Dietze's convenience and Subcontractor shall be entitled to the applicable compensation provided in Article 16. Subcontractor's remedies under this Article 10.b. shall be exclusive. Nothing herein shall bar withholdings by Dietze permitted by other provisions of this Subcontract.

11. **Settlement of Disputes**

a. In the event of any dispute involving the work performed or to be performed, Dietze shall issue a decision which shall be followed by Subcontractor, without interruption, deficiency, or delay. If Subcontractor does not agree with such decision, Subcontractor may make a claim under Article 9, and the matter shall be resolved as set forth in Article 11.b. or 11.c. as applicable. If the Subcontractor prevails, Subcontractor's sole remedy shall be an equitable adjustment determined as provided in Article 11.b. or 11.c. as applicable. In addition to notice required by Article 9.d. or the Contract Documents, notification of any claim for the equitable adjustment must be asserted in writing not later than ten (10) days after Subcontractor's knowledge of the claim, and if Article 11.b. is applicable, within sufficient time to allow Dietze to give notice to the Owner under the Contract Documents.

b. In case of any dispute between Dietze and Subcontractor, in any way relating to or arising from any act or omission of the Owner or involving the Contract Documents, Subcontractor agrees to be bound to Dietze to the same extent that Dietze is bound to the Owner, by the terms of the Contract Documents, and by any and all preliminary and final decisions or determinations made thereunder by the party, board or court so authorized in the Contract Documents or by law, whether or not Subcontractor is a party to such proceedings. In case of such dispute, Subcontractor will comply with all provisions of the Contract Documents allowing a reasonable time for Dietze to analyze and forward to the Owner any required communications or documentation. Dietze will, at its option, (1) present to the Owner, in Dietze's name, or (2) authorize Subcontractor to present to the Owner, in Dietze's name, all of Subcontractor's claims and answer the Owner's claims involving Subcontractor's work, whenever Dietze is permitted to do so by the terms of the Contract Documents. Dietze will further invoke on behalf of Subcontractor, or allow Subcontractor to invoke, those provisions in the Contract Documents for determining disputes. Nothing herein shall require Dietze to certify a claim under a government contract when it cannot do so in good faith. If such dispute is prosecuted or defended by Dietze, Subcontractor, at its own expense, agrees to furnish all documents, statements, witnesses, and other information required by Dietze and to pay or reimburse Dietze for all costs incurred by Dietze in connection with the dispute including attorneys' fees. The Subcontract price shall be adjusted by Subcontractor's allocable share determined in accordance with Article 9. hereof.

c. To the extent not resolved under Article 11.b. above, any dispute between Dietze and Subcontractor shall, at Dietze's sole option, be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. If Dietze elects to arbitrate, then the arbitration shall be in Fairfax County, Virginia. The foregoing agreement to arbitrate shall be specifically enforceable in any court of competent jurisdiction. Upon its request, Dietze shall be entitled to consolidation or joinder of any arbitration involving Subcontractor with related arbitrations involving other parties. The award rendered by the arbitrators shall be final and judgment may be entered upon it in accordance with applicable law in any court of competent jurisdiction. If Dietze notifies Subcontractor that Dietze contends any arbitration or lawsuit brought under this Article 11.c. involves a controversy within the scope of Article 11.b., the dispute process shall be stayed until the procedures under Article 11.b. are completed. In the event of any lawsuit under this clause, the Courts of Virginia shall have sole and exclusive jurisdiction. DUE TO THE SPECIALIZED NATURE OF CONSTRUCTION LITIGATION, EACH PARTY HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY. Subcontractor hereby consents to jurisdiction and venue in Virginia.

12. **Warranty**

Subcontractor warrants its work hereunder to Dietze on the same terms, and for the same period, as Dietze warrants the work to the Owner under the Contract Documents; and, with respect to Subcontractor's work, Subcontractor shall assume all warranty obligations and responsibilities of Dietze under the Contract Documents.

13. **Liens**

a. In the event that liens are filed by anyone in relation to the labor and/or material furnished pursuant to this Subcontract, Subcontractor agrees to have the same discharged, by posting a bond with the appropriate authorities, or otherwise, within three (3) days of notice. In the event such lien is not so discharged, Dietze may discharge the lien itself holding Subcontractor responsible for all costs and obligations incurred.

b. Subcontractor shall, as part of each request for partial payment other than the initial request, furnish claim releases and lien waivers with respect to all work performed and materials supplied through the date of the immediately preceding request for partial payment.

c. Prior to final payment, Subcontractor shall provide to Dietze a release of its liens and claims and all liens and claims of all persons furnishing labor and/or materials for the performance of this Subcontract, and satisfactory evidence that there are no other liens or claims whatsoever outstanding against the work relating to this Subcontract.

14. **Inspection and Acceptance**

a. Subcontractor shall provide appropriate facilities at all reasonable times for inspection by Dietze or the Owner of the work and materials provided under this Subcontract, whether at the Project site or any other place where such work or materials may be in preparation, manufacture, storage or installation. Subcontractor shall promptly replace or correct any work or materials which Dietze or the Owner shall reject as failing to conform to the requirements of this Subcontract. If, in the opinion of Dietze, it is not expedient to correct or replace all or any part of rejected work or materials, then Dietze, at its option, may deduct from the payments due, or to become due, to Subcontractor, such amount as, in Dietze's reasonable judgment, will represent (i) the difference between the fair value of the rejected work and materials and the value thereof if it complied with this Subcontract, or (ii) the cost of correction, whichever Dietze determines is more appropriate.

b. Subcontractor's remedy for wrongful rejection of work pursuant to Article 14.a. shall be limited to Dietze's remedy under the Contract Documents if rejection is by the Owner or by Dietze at request of the Owner. Dietze shall be liable for any increased direct costs caused by its wrongful rejection of work if the Owner was not involved in said rejection.

c. The work shall be accepted according to the terms of the Contract Documents. However, unless otherwise agreed in writing, entrance and use by the Owner or Dietze, shall not constitute acceptance of the work.

15. **Inconsistencies and Omissions**

Should inconsistencies or omissions appear in the Contract Documents, it shall be the duty of Subcontractor to timely notify Dietze in writing. Upon receipt of said notice, Dietze shall instruct Subcontractor as to the measures to be taken, and Subcontractor shall comply with Dietze's instructions. Nothing herein shall bar Subcontractor's right to seek adjustment under Article 9.b. if allowable under the Contract Documents.

16. Termination for Convenience

Dietze shall have the right to terminate for convenience Subcontractor's performance of all or a part of the Subcontract work by providing Subcontractor with a written notice of termination for convenience, to be effective upon receipt by Subcontractor. If there has been a termination of Dietze's contract with the Owner, the Subcontractor shall be paid the amount due from the Owner for its work, as provided in the Contract Documents, after payment therefore by the Owner to Dietze. If Dietze's contract has not been terminated, Subcontractor shall be paid the reasonable value of work performed by Subcontractor prior to termination plus reasonable direct close-out costs but in no event shall Subcontractor be entitled to unabsorbed overhead or anticipatory profit. If no work has been performed by Subcontractor at the time of termination, Subcontractor shall be paid the sum of $100.00 for its undertaking an obligation to perform.

17. Approvals

a. Subcontractor warrants and agrees that all requisite approvals from the Owner as to its eligibility to serve as a subcontractor and the approvals of all materials and performance of the work as required by the Contract Documents are obtainable.

b. Subcontractor shall deliver to Dietze copies of shop drawings, cuts, samples, material lists and other submissions required by Dietze or the Contract Documents within sufficient time so as not to delay performance of the Project or within sufficient time for Dietze to submit the same within the time stated in the Contract Documents, whichever is earlier. Submissions shall be in strict accordance with the Contract Documents, provided however, if Subcontractor wishes to propose a deviation from the Contract Documents, such deviation shall be clearly identified on the submission and accompanied by a letter describing such deviation in detail and the effect, if any, on Subcontractor's work and time of performance. Requested deviations will be allowed only when specific written approval referencing the deviation is given to Subcontractor. No general approval granted by Dietze or the Owner shall relieve Subcontractor from complying with the Contract Documents.

c. Dietze's review of shop drawings, cuts, samples, material lists and other submissions shall not be construed as a complete check or approval nor shall it relieve the Subcontractor from responsibility for errors of any sort therein, or from the necessity of furnishing any work required by the Contract Documents which may have been omitted from the shop drawings, cuts, samples, material lists or other submissions.

18. Cleanup

Subcontractor shall clean its work and remove all debris resulting from its work in a manner that will not impede either the progress of the Project or of other trades. Dietze shall have the right to perform cleanup itself and charge Subcontractor the reasonable cost thereof including an allocation of the cost of cleanup not identifiable to any source.

19. Assignment and Subcontracting

a. Subcontractor shall not assign or transfer this Subcontract, or funds due hereunder, without the prior written consent of Subcontractor's surety and Dietze. Dietze shall not unreasonably withhold its consent to the assignment of funds due hereunder. Lower-tier subcontracts are subject to the provisions of this Subcontract, and Subcontractor shall insert in Subcontractor's subcontracts all provisions required by the Contract Documents or necessary to enable Subcontractor to comply with the terms hereof. Subcontracting by Subcontractor shall not abrogate any obligation of Subcontractor under this Subcontract.

b. Subcontractor, by execution of this Subcontract, contingently assigns to Dietze all Subcontractor's subcontracts. The assignment of each of Subcontractor's subcontracts shall take effect only upon Subcontractor's termination for default under Article 10.a. and Dietze's affirmative acceptance of the assignment of the specific subcontract by written notice to Subcontractor and Subcontractor's subcontractor. Dietze shall have no liability to any of Subcontractor's subcontractors unless and until Dietze affirmatively accepts the assignment as provided above.

20. Patents and Royalties

Except as otherwise provided by the Contract Documents, Subcontractor shall pay all royalties and license fees which may be due with respect to its work. Subcontractor shall defend all suits or claims for infringement of any patent rights that may be brought against Dietze or the Owner arising out of its work, and shall be liable to Dietze and the Owner for all loss, including all costs and expenses, on account thereof.

21. Taxes and Permits

a. Except as otherwise provided by the Contract Documents, Subcontractor agrees to pay and comply with and hold Dietze harmless against the payment of all Federal, state and local contributions, taxes, duties or premiums arising out of the performance of this Subcontract, and all sales, use or other duties or taxes of whatever nature levied or assessed against the Owner, Dietze, or Subcontractor arising out of this Subcontract including any interest or penalties. Subcontractor waives any and all claims for additional compensation because of any new duties or taxes or any increase in the aforementioned duties or taxes unless payment therefore is specifically provided for in the Contract Documents.

b. Subcontractor shall obtain and pay for all permits, licenses, fees and certificates of inspection necessary for the prosecution and completion of work. Subcontractor shall arrange for all necessary inspections and approvals by public officials.

22. Laws, Regulations and Ordinances

a. Subcontractor shall be bound by, and, at its own cost, shall comply with all Federal, state and local laws, codes, ordinances and regulations applicable to this Subcontract and the performance of the work hereunder whether by reason of general law or by reason of provisions in the Contract Documents. Subcontractor and all lower-tier subcontractors shall be duly licensed to operate under the law of the applicable jurisdictions.

b. Specifically and without limitation, Subcontractor and all employees and agents thereof shall comply with the applicable requirements issued pursuant to the Occupational Safety and Health Act of 1970, as amended, all other applicable health and safety laws and regulations, and all laws and regulations applicable to the hiring of aliens.

c. Subcontractor shall be liable to Dietze and the Owner for all loss, cost and expense attributable to any acts of commission or omission by Subcontractor, its employees and agents, and lower-tier subcontractors resulting from failure to comply with any Federal, state or local laws, codes, ordinances or regulations including, but not limited to, any fines, penalties or corrective measures.

d. Unless otherwise provided in the Contract Documents, the terms and conditions of this Subcontract shall be interpreted in accordance with the laws of the jurisdiction where the Project is located.

23. Safety

a. Subcontractor's safety and health program for the Project shall incorporate, as a minimum, all of the policies and procedures of Dietze's Project Safety and Health Program. Subcontractor acknowledges that it has an obligation to perform its work using safe and healthful methods and to comply with its company safety and health program and hazard communication (HAZCOM) program for the Project, the Project Documents, the Subcontract, the Occupational Safety and Health Administration standards, and all other federal, state, and local codes, laws, and regulations.

b. Subcontractor accepts responsibility for the management and implementation of its company safety and health program and HAZCOM program for this Project and shall ensure that its employees, subcontractors and suppliers, regardless of tier, know, understand, properly implement and are held accountable for the complete project safety and health program requirements. Subcontractor assumes full responsibility to provide and maintain, within its scope of work, a safe and healthful workplace for its employees, as well as for the benefit of all contractors, fellow workers and the general public. Subcontractor agrees to assume the obligation to notify Dietze of all hazards discovered that it does not control and did not create.

c. Subcontractor shall be liable to Dietze for any additional costs Dietze incurs as a result of Subcontractor's failure to operate safely. Dietze may conduct safety inspections from time to time. Such inspections shall not relieve Subcontractor from its obligations to adhere to safety requirements nor shall such inspections create any Dietze liability. Copies of Dietze's Safety and Health Program will be made available to Subcontractor upon request.

24. Labor

a. Should any workers performing work covered by this Subcontract engage in any strike or other work stoppage or cease to work due to picketing or a labor dispute of any kind, such circumstances shall, notwithstanding any provision of the Contract Documents, be deemed a failure to perform by Subcontractor and Dietze's rights shall be governed by Articles 6 and 10 of the Subcontract Agreement.

b. Subcontractor understands that Dietze, other Subcontractors and/or other contractors of the Owner may employ both Union and Non-Union workers on the project. If required by the Contract Documents or specified in an Exhibit to this Subcontract, Subcontractor agrees to employ union labor.

c. Subcontractor agrees, in the event of a labor dispute, to use all lawful means available under law, any applicable union agreement or project agreement to cure the dispute as quickly as possible so as to cause the minimum delay to the project. In the event the Subcontractor fails to act expeditiously, Dietze may exercise any rights it may have under the law and the Subcontractor will indemnify Dietze for any cost incurred.

25. Equal Opportunity

a. In connection with the performance of work under this Subcontract, Subcontractor agrees not to discriminate against any employee or applicant for employment because of race, religion, sex, color or national origin. The aforesaid provision shall include, but not be limited to, the following: employment, upgrading, demotion or transfer, recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. Subcontractor agrees to post hereafter, in conspicuous places, available for employees and applicants for employment, notices, prepared by Subcontractor, and approved by the government when required, setting forth the provisions of this Article 25.

b. Subcontractor shall permit access to its books, records and accounts by representatives of Dietze or the Owner for purposes of investigation to ascertain compliance with the provisions of this Article 25.

c. In the event of Subcontractor's noncompliance with the equal opportunity provisions of this Subcontract, this Subcontract may be terminated for default.

d. Subcontractor shall include the provisions of this Article 25. in Subcontractor's subcontracts. The requirements of this Article 25., shall be in addition to any Equal Opportunity provisions of the Contract Documents.

26. Information Required by Owner

In addition to the information to be provided by Subcontractor pursuant to other provisions of this Subcontract, Subcontractor hereby agrees to provide, at no additional cost to Dietze, and in a prompt and timely fashion so as not to disrupt the performance of this Subcontract or the contract between Dietze and the Owner, any and all additional information relating to this Subcontract which is required either by the Contract Documents or by law.

27. Privity

Until Subcontractor's obligations under this Subcontract are completely fulfilled, Subcontractor agrees not to perform any work directly for the Owner or any of its tenants or deal directly with the Owner's representatives in connection with the Project, unless otherwise directed in writing by Dietze. All work for this Project performed by Subcontractor shall be processed and handled exclusively by Dietze.

28. Notices

All notices shall be addressed to the parties at the addresses set out herein, and shall be considered as delivered when postmarked if dispatched by registered or certified mail, when confirmed if sent by telegram or telecopy, when signed for when delivered by hand, and when received in all other cases.

29. Severability and Waiver

The partial or complete invalidity of any one or more provisions of this Subcontract shall not affect the validity or continuing force and effect of any other provision. If any provision is invalid, in whole or in part, the provision shall be considered reformed to reflect the intent thereof to the greatest extent possible consistent with

law. The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Subcontract, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

30. Interpretation of Contract Documents

   a. It is the intention of the parties that all terms of this Subcontract are to be considered as complementary. However, in the event that such an interpretation is not possible, the order of precedence of the documents forming this Subcontract shall be (1) modifications of any documents forming part of this Subcontract; (2) this Subcontract, unless the Contract Documents impose a higher standard or greater requirement on Subcontractor, in which case the Contract Documents; (3) the Contract Documents, unless the provisions of (2) apply.

   b. In the event of a conflict between or among modifications, the later in date shall prevail; in the event of a conflict between or among the terms of this Subcontract, the higher standard or greater requirement for Subcontractor shall prevail; and in the event of a conflict between or among the terms of the Contract Documents, the higher standard or greater requirement for Subcontractor shall prevail.

   c. Except as otherwise provided, all references herein to days shall be to calendar days.

   d. The term "Subcontractor's subcontractor" shall mean any subcontractor, vendor or materialman who is supplying material or performing work in connection with the Subcontract and who has a direct contractual relationship with Subcontractor. The term "lower-tier subcontractor" shall mean any subcontractor, vendor or materialman at any tier supplying material or performing work in connection with the Subcontract. The term "subcontract" when referencing contractual arrangements between Subcontractor and Subcontractor's subcontractor shall include purchase orders and contracts for construction, materials and/or services relating to the Project.

   e. Termination under Articles 10, or 16, shall not relieve Subcontractor from obligations in connection with work performed prior to termination or abrogate any provisions herein dealing with resolution of disputes.

31. Advertising - Signs

   Subcontractor, lower-tier subcontractors, and their employees shall not take photographs of the work on site, publish or display advertising matter of any description relating to the Project, or display signs at or near the Project without first obtaining the written consent of Dietze and the Owner.

IN WITNESS WHEREOF, the parties, by their duly authorized representatives, have hereunto executed this Subcontract, on the day and year above written.

*Pico letter of 12.29.03 is part of this agreement.*

_____          SUB NAME
Natalie Mulitz                         PICO Industries Incorporated

Attest                                 By Lewis Mulitz          12.29.03
                                                                Date

                                       The Dietze Construction Group, Inc.
                                       (Dietze)

_____          _____    _____
Attest                                 By Kevin Stone                    Date
                                       Project Manager

ASHLEY BIRD 1703 4649747

# PICO INDUSTRIES, INC.
611 W. Ostend Street.  Baltimore, MD 21230
Phone : (410) 547-1900                              Fax : (410) 547-1982

Date : 12·29·03                     Page :  1  of  2

Sent By :  Lewis Mulitz

Attention To : RICK VINING        Firm: Dietze Const. Group

Job : LANGSTON LOFTS              Subject: Subcontract 19 Sep 03
F. 202 462 7730

Thank you for your sub-contract agreement. We look forward to working for you on this contract. We have reviewed the document and have the following minor modifications.

4.a Change orders or other sub-contract provisions must be approved by both parties.

4.b Should the retainage be reduced it shall likewise be reduced to the Sub-contractor.

4.g Any action by Dietz shall be restricted to this sub-contract.

4.h Final payment shall be due due upon completion of sub-contractor's work.

4.j Dietz shall pay the sub-contractor the same pro-rata received from owner.

5. The sub-contractor shall not be responsible for discrepancies and conflicts and omissions within the contract documents.

6.a The sub-contractor shall not be responsible for work delivered only and placed by others.

6.b It is acknowledged that the sub-contractor could not proceed timely due to discrepancies and omissions in the contract documents, consequently there has been an initial delay of several months in preparing shop drawings.

6.c This clause shall not exclude acts, omissions or negligence of other parties to contract.

6.d. add "providing all items mentioned meet code and regulation requirements".

6.e add "or when received from insurance coverage".

7. Sub-contractors insurance coverage shall be as described in its Insurance Certificates.

8. All schedules involving the sub-contractor must be approved by the Sub-contractor.

9, 10, 11. All disputes shall be resolved by mediation or arbitration, in the unlikely

Jan 11 05 03:34p    PI., Inc.    1(4 J)547-1982    P.21

# PICO INDUSTRIES, INC.
611 W. Ostend Street  Baltimore, MD 21230

Date: 12-27-05

Sent By: Lewis Mulitz

Attention To: Rick Vining    Firm: Dirty Const Group

Job: Langston Lofts    Subject: Subcontract 19 Sep 03

event of termination it shall be for convenience (in fact) only. Venue for mediation or arbitration shall be as agreed to by the parties.

13.2 add "unless the lien is the result of a breach of contract."

18. Cleanup cost charged must be identifiable to PICO.

24b. Subcontractor will employ non-union labor.

25c. Change default to "convenience."

Respectfully Submitted,
Pico Industries Inc.
Lewis Mulitz, President.

# THE AMERICAN INSTITUTE OF ARCHITECTS



Bond No. 6102301878

AIA Document A312

# Payment Bond

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

CONTRACTOR (Name and Address):

The Dietze Construction Group, Inc
3859 Centerview Drive
Chantilly, VA 20151

SURETY (Name and Principal Place of Business):

United States Fire Insurance Company
5500 Cherokee Avenue, Suite 300
Alexandria, VA 22312

OWNER (Name and Address):

Uptown Partners, LLC c/o Metropolis Development Co., LLC
1327 14th Street, NW, Suite 300
Washington, DC

CONSTRUCTION CONTRACT
  Date:
  Amount: ($ 11,800,000.00   ) Eleven Million Eight Hundred Thousand Dollars and 00/100
  Description (Name and Location): Langston Lofts, 1390 V Street, NW, Washington, DC

BOND
  Date (Not earlier than Construction Contract Date):
  Amount: ($                    )
  Modifications to this Bond:                    ☒ None                            ☐ See Page 6

CONTRACTOR AS PRINCIPAL
Company:                    (Corporate Seal)

The Dietze Construction Group, Inc

Signature: _____
Name and Title:

SURETY
Company:                    (Corporate Seal)

United States Fire Insurance Company

Signature: _____
Name and Title: Frank C. Roddey Jr.
                        Attorney-in-Fact

(Any additional signatures appear on page 6)

(FOR INFORMATION ONLY—Name, Address and Telephone)
AGENT or BROKER:
Thomas Rutherfoord, Inc.
707 East Main Street, Suite 1800
Richmond, VA 23218
804-780-0611

OWNER'S REPRESENTATIVE (Architect, Engineer or other party):

AIA DOCUMENT A312 · PERFORMANCE BOND AND PAYMENT BOND · DECEMBER 1984 ED. · AIA ®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING · MARCH 1987

A312-1984  4

EXHIBIT
B

1 The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference.

2 With respect to the Owner, this obligation shall be null and void if the Contractor:

   2.1 Promptly makes payment, directly or indirectly, for all sums due Claimants, and

   2.2 Defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity whose claim, demand, lien or suit is for the payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, provided the Owner has promptly notified the Contractor and the Surety (at the address described in Paragraph 12) of any claims, demands, liens or suits and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety, and provided there is no Owner Default.

3 With respect to Claimants, this obligation shall be null and void if the Contractor promptly makes payment, directly or indirectly, for all sums due.

4 The Surety shall have no obligation to Claimants under this Bond until:

   4.1 Claimants who are employed by or have a direct contract with the Contractor have given notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

   4.2 Claimants who do not have a direct contract with the Contractor:

     .1 Have furnished written notice to the Contractor and sent a copy, or notice thereof, to the Owner, within 90 days after having last performed labor or last furnished materials or equipment included in the claim stating, with substantial accuracy, the amount of the claim and the name of the party to whom the materials were furnished or supplied or for whom the labor was done or performed; and

     .2 Have either received a rejection in whole or in part from the Contractor, or not received within 30 days of furnishing the above notice any communication from the Contractor by which the Contractor has indicated the claim will be paid directly or indirectly; and

     .3 Not having been paid within the above 30 days, have sent a written notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and enclosing a copy of the previous written notice furnished to the Contractor.

   4.3 Provided however, any other provision in this bond not with standing, no claimant shall have any greater rights against Principal or Surety under this bond than such claimant would have against Owner, or any property of Owner or any improvements being constructed upon any property of Owner pursuant to the Contract ("Owners Property"). Principal and Surety shall be entitled to assert as a defense to any claim asserted under the bond any defense which Owner and to the extent not resulting in liability to Owner or Owner's Property. Principal and Surety, would be able to assert under any mechanic's lien per section 43-7 of the annotated code of Virginia or other laws. This bond is provided solely for Owner's benefit, and may be amended or cancelled at any time by the parties hereto, whether or not a notice of claim shall have been given, and no claimant shall have any rights hereunder except as expressly provided above.

5 If a notice required by Paragraph 4 is given by the Owner to the Contractor or to the Surety, that is sufficient compliance.

6 When the Claimant has satisfied the conditions of Paragraph 4, the Surety shall promptly and at the Surety's expense take the following actions:

   6.1 Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

   6.2 Pay or arrange for payment of any undisputed amounts.

7 The Surety's total obligation shall not exceed the amount of this Bond, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

8 Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any Construction Performance Bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and the Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

9 The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligations to make payments to, give notices on behalf of, or otherwise have obligations to Claimants under this Bond.

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED • AIA®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING • MARCH 1987

A312-1984   5

10 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

11 No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the location in which the work or part of the work is located or after the expiration of one year from the date (1) on which the Claimant gave the notice required by Subparagraph 4.1 or Clause 4.2.3, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

12 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page. Actual receipt of notice by Surety, the Owner or the Contractor, however accomplished, shall be sufficient compliance as of the date received at the address shown on the signature page.

13 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

14 Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor shall promptly furnish a copy of this Bond or shall permit a copy to be made.

15 DEFINITIONS

15.1 Claimant: An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Contract. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

15.2 Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

15.3 Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corporate Seal) | Company: | (Corporate Seal) |
| Signature: | | Signature: | |
| Name and Title: | | Name and Title: | |
| Address: | | Address: | |

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED. • AIA ®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING • MARCH 1987

A312-1984  6

10/11/2015 23:40 FAX @002

# APPLICATION AND CERTIFICATE FOR PAYMENT

AIA DOCUMENT G702 (Instructions on reverse side) PAGE 1 OF 2 PAGES

| | |
|---|---|
| TO CONTRACTOR: The Dietze Construction Group, 3859 Centerview Drive, Suite 200, Chantilly, VA 20151 | PROJECT: The Langston Lofts, Job No. U4090, 1390 "V" Street, NW, Washington DC |
| FROM SUBCONTRACTOR: Pico Industries, Inc., 611 W. Ostend Street, Baltimore, MD 21230 | PICO's Job #: 23019 |
| CONTRACT FOR: Misc. Steel & Bronze Items | Revised DIETZE PURCHASE ORDER #: 507500.00 |

APPLICATION NO.: 25
PERIOD TO: 30-Nov-03
CONTRACT DATE:

Distribution to:
[X] CONTRACTOR
[ ] Sub Contractor

## SUBCONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for Payment, as shown below, in connection with the Contract
Continuation Sheet, AIA Document G703, is attached.

1. ORIGINAL CONTRACT SUM ............................................ $ 741,000.00
2. Net change by Change Orders ......................................... $ 571,699.74
   (Line 1 + 2)
3. TOTAL CONTRACT SUM .............................................. $ 1,312,699.74
4. TOTAL COMPLETE & STORED
   TO DATE .......................................................... $1,312,699.24
   (Column G on G703)
5. RETAINAGE 10%
   a. Completed Work                          0%    0.00
   (Column D+E on G703)
   b. Stored Material                          0%    0.00
   (Column F on G703)
   Total Retainage (Line 5A + 5b or
   Total in Column I of G703
6. TOTAL EARNED LESS
   RETAINAGE (Line 4 less Line 5 Total) ............................... $1,312,699.24
7. LESS PREVIOUS CERTIFICATES FOR PAYMENT
   (Line 6 from prior Certificate) ...................................... 704,968.38
8. CURRENT PAYMENT DUE .............................................. $607,730.86
9. BALANCE TO FINISH, PLUS
   RETAINAGE
   (Line 3 less Line 6) ................................................ $ 0.50

### CHANGE ORDER SUMMARY

| | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in previous months by Owner | | |
| TOTAL | | |
| Approved this Month | | |
| NUMBER | DATE APPROVED | |
| TOTALS | | |
| Net changes by Change Orders | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information, and belief, the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Contractor, and that current payment shown herein is now due.

SUBCONTRACTOR:   PICO Industries, Inc.

By: _____  Date: _____
    Lewis Mulitz, President

Subscribed and sworn to before me this ___ day of _____, 2005

Witness: _____

AMOUNT CERTIFIED ............................................... $ _____
(Attach explanation if amount certified differs from the amount applied for)
CONTRACTOR:

By: _____  Date: _____
This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

## CONTRACTOR'S CERTIFICATE FOR PAYMENT

EXHIBIT C

**CONTINUATION SHEET -**
APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.

The Langston Lofts

APPLICATION NUMBER: 25
APPLICATION DATE: 28-Nov-05
PERIOD TO: 30-Nov-05

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D+E) | WORK COMPLETED THIS PERIOD | MATERIALS PRESENTLY STORED (Not E or D) | TOTAL COMPLETED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C-G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | A Structural Steel, Lintels & angles | | | | | | | | |
| 1 | Engineering | 23,860.00 | 23,860.00 | | | 23,860.00 | 100.0% | 0.00 | 2,386.00 |
| | Materials | 107,373.00 | 107,373.00 | | | 107,373.00 | 100.0% | 0.00 | 10,737.30 |
| | Fabrication | 71,581.00 | 71,581.00 | | | 71,581.00 | 100.0% | 0.00 | 7,158.10 |
| | Erection | 35,791.00 | 35,791.00 | | | 35,791.00 | 100.0% | 0.00 | 3,579.10 |
| 2 | Steel Joists | | | | | | | | |
| | Engineering | 13,260.00 | 13,260.00 | | | 13,260.00 | 100.0% | 0.00 | 1,326.00 |
| | Materials | 59,670.00 | 59,670.00 | | | 59,670.00 | 100.0% | 0.00 | 5,967.00 |
| | Fabrication | 39,780.00 | 39,780.00 | | | 39,780.00 | 100.0% | 0.00 | 3,978.00 |
| | Erection | 19,890.00 | 19,890.00 | | | 19,890.00 | 100.0% | 0.00 | 1,989.00 |
| 3 | Metal Deck | | | | | | | | |
| | Engineering | 7,520.00 | 7,520.00 | | | 7,520.00 | 100.0% | 0.00 | 752.00 |
| | Materials | 33,840.00 | 33,840.00 | | | 33,840.00 | 100.0% | 0.00 | 3,384.00 |
| | Fabrication | 22,560.00 | 22,560.00 | | | 22,560.00 | 100.0% | 0.00 | 2,256.00 |
| | Erection | 11,280.00 | 11,280.00 | | | 11,280.00 | 100.0% | 0.00 | 1,128.00 |
| 4 | Steel Stairs | | | | | | | | |
| | Engineering | 16,129.00 | 16,129.00 | | | 16,129.00 | 100.0% | 0.00 | 1,612.90 |
| | Materials | 72,583.00 | 72,583.00 | | | 72,583.00 | 100.0% | 0.00 | 7,258.30 |
| | Fabrication | 48,388.00 | 48,388.00 | | | 48,388.00 | 100.0% | 0.00 | 4,838.80 |
| | Erection | 24,195.00 | 24,195.00 | | | 24,195.00 | 100.0% | 0.00 | 2,419.50 |
| 5 | Handrails & Fences | | | | | | | | |
| | Engineering | 8,215.00 | 8,215.00 | | | 8,215.00 | 100.0% | 0.00 | 821.50 |
| | Materials | 36,967.00 | 36,967.00 | | | 36,967.00 | 100.0% | 0.00 | 3,696.70 |
| | Fabrication | 24,645.00 | 24,645.00 | | | 24,645.00 | 100.0% | 0.00 | 2,464.50 |
| | Erection | 12,323.00 | 12,323.00 | | | 12,323.00 | 100.0% | 0.00 | 1,232.30 |
| 6 | Ladders & elevator Sill Angles | | | | | | | | |
| | Engineering | 334.00 | 334.00 | | | 334.00 | 100.0% | 0.00 | 33.40 |
| | Materials | 1,505.00 | 1,505.00 | | | 1,505.00 | 100.0% | 0.00 | 150.50 |
| | Fabrication | 1,004.00 | 1,004.00 | | | -1,004.00 | 100.0% | 0.00 | 100.40 |
| | Erection | 502.00 | 502.00 | | | 502.00 | 100.0% | 0.00 | 50.20 |
| 7 | Gratings | | | | | | | | |
| | Engineering | 1,750.00 | 1,750.00 | | | 1,750.00 | 100.0% | 0.00 | 175.00 |
| | Materials | 7,000.00 | 7,000.00 | | | 7,000.00 | 100.0% | 0.00 | 700.00 |
| | Fabrication | 5,250.00 | 5,250.00 | | | 5,250.00 | 100.0% | 0.00 | 525.00 |
| | Erection | 3,500.00 | 3,500.00 | | | 3,500.00 | 100.0% | 0.00 | 350.00 |

# CONTINUATION SHEET

APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.

The Langton Lofts

APPLICATION NUMBER: 25
APPLICATION DATE: 28-Nov-05
PERIOD TO: 30-Nov-05

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D+E) | WORK COMPLETED THIS PERIOD | MATERIALS PRESENTLY STORED (Not D or E) | TOTAL COMPLETED TO DATE (D+E+F) | % (G÷C) | BALANCE TO FINISH (C-G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 8 | Tubes @ OH doors & Louver frms | | | | | | | | |
| | Engineering | 1,954.00 | 1,954.00 | | | 1,954.00 | 100.0% | 0.00 | 195.40 |
| | Materials | 8,795.00 | 8,795.00 | | | 8,795.00 | 100.0% | 0.00 | 879.50 |
| | Fabrication | 5,864.00 | 5,864.00 | | | 5,864.00 | 100.0% | 0.00 | 586.40 |
| | Erection | 2,932.00 | 2,932.00 | | | 2,932.00 | 100.0% | 0.00 | 293.20 |
| 9 | Wire Mesh & partitions & screens | | | | | | | | |
| | Engineering | 360.00 | 360.00 | | | 360.00 | 100.0% | 0.00 | 36.00 |
| | Materials | 1,617.00 | 1,617.00 | | | 1,617.00 | 100.0% | 0.00 | 161.70 |
| | Fabrication | 1,079.00 | 1,079.00 | | | 1,079.00 | 100.0% | 0.00 | 107.90 |
| | Erection | 539.00 | 539.00 | | | 539.00 | 100.0% | 0.00 | 53.90 |
| 10 | Corner guard, bollards & strap | | | | | | | | |
| | Engineering | 615.00 | 615.00 | | | 615.00 | 100.0% | 0.00 | 61.50 |
| | Materials | 2,775.00 | 2,775.00 | | | 2,775.00 | 100.0% | 0.00 | 277.50 |
| | Fabrication & delivery | 2,775.00 | 2,775.00 | | | 2,775.00 | 100.0% | 0.00 | 277.50 |
| 11 | Sign frms & metal panels | | | | | | | | |
| | Engineering | 100.00 | 100.00 | | | 100.00 | 100.0% | 0.00 | 10.00 |
| | Materials | 450.00 | 450.00 | | | 450.00 | 100.0% | 0.00 | 45.00 |
| | Fabrication | 300.00 | 300.00 | | | 300.00 | 100.0% | 0.00 | 30.00 |
| | Erection | 150.00 | 150.00 | | | 150.00 | 100.0% | 0.00 | 15.00 |
| X1 | Anchor bolts (150 each) $484 | 484.00 | 484.00 | | | 484.00 | 100.0% | 0.00 | 48.40 |
| X2 | Plates (5-PL1, 2-PL2, 3-PL3) $937 | 937.00 | 937.00 | | | 937.00 | 100.0% | 0.00 | 93.70 |
| X3 | Increase cost of steel $96,485 | 96,485.00 | 96,485.00 | | | 96,485.00 | 100.0% | 0.00 | 9,648.50 |
| X4 | B6-1 Replacement $702 | 702.00 | 702.00 | | | 702.00 | 100.0% | 0.00 | 70.20 |
| X5 | B6-3 Replacement $785 | 785.00 | 785.00 | | | 785.00 | 100.0% | 0.00 | 78.50 |
| X6 | anchor bolt layout @ mezzanine | 1,153.00 | 1,153.00 | | | 1,153.00 | 100.0% | 0.00 | 115.30 |
| X7 | Mod to fabricated members $23,635 | 23,635.00 | 23,635.00 | | | 23,635.00 | 100.0% | 0.00 | 2,363.50 |
| X8 | Extra columns @ mezzanine | 2,739.00 | 2,739.00 | | | 2,739.00 | 100.0% | 0.00 | |
| X9 | Extra Exp bolts @ joist bearing | 2,190.00 | 2,190.00 | | | 2,190.00 | 100.0% | 0.00 | |
| X10 | Change base plate orientation | 4,400.00 | 4,400.00 | | | 4,400.00 | 100.0% | 0.00 | 440.00 |
| X11 | PR 13-infill slab in Unit 118 | 3,254.00 | 3,254.00 | | | 3,254.00 | 100.0% | 0.00 | 325.40 |
| X12 | Cut embed plates | 220.00 | 220.00 | | | 220.00 | 100.0% | 0.00 | |
| X13 | Change base plates | 4,400.00 | 4,400.00 | | | 4,400.00 | 100.0% | 0.00 | |
| X14 | Changes to Stair A | 8,350.00 | 8,350.00 | | | 8,350.00 | 100.0% | 0.00 | |
| X15 | Modify 6 columns | 10,236.00 | 10,236.00 | | | 10,236.00 | 100.0% | 0.00 | 1,023.60 |

# CONTINUATION SHEET -

APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar

The Langton Lofts

APPLICATION NUMBER: 25
APPLICATION DATE: 28-Nov-05
PERIOD TO: 30-Nov-05

| A | B | C | D | E | F | G | | H |
|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D+E) | WORK COMPLETED THIS PERIOD | MATERIALS PRESENTLY STORED (Not D or E) | TOTAL COMPLETED TO DATE (D+E+F) | % (G÷C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| X16 | Crane Operator | 34,254.24 | 34,254.24 | | | 34,254.24 | 100.0% | | |
| X17 | Set leveling plates nuts | 2,734.00 | 2,734.00 | | | 2,734.00 | 100.0% | | |
| X18 | 50 Base Plates | 12,516.00 | 12,516.00 | | | 12,516.00 | 100.0% | | |
| X19 | Drilled missed anchor bolts @ 2nd | 2,961.50 | 2,961.00 | | | 2,961.00 | 100.0% | | |
| X20 | Premium time | 17,655.00 | 17,655.00 | | | 17,655.00 | 100.0% | | |
| X21 | Re-engineer shop drawings | 98,164.00 | 98,164.00 | | | 98,164.00 | 100.0% | | |
| X22 | Repair - Elevator steel | 532.00 | 532.00 | | | 532.00 | 100.0% | | |
| X23 | Extra @ Mezzanine Canopies | 10,952.00 | 10,952.00 | | | 10,952.00 | 100.0% | | |
| X24 | Splicing front canopy | 10,648.00 | 10,648.00 | | | 10,648.00 | 100.0% | | |
| X25 | Remobilization for stairs@loft | 3,000.00 | 3,000.00 | | | 3,000.00 | 100.0% | | |
| X26 | Missing embed plates | 924.00 | 924.00 | | | 924.00 | 100.0% | | |
| X27 | Rebuild gate @ Garden Entrance | 5,269.00 | 5,269.00 | | | 5,269.00 | 100.0% | | |
| X28 | Delay claim | 212,120.00 | 212,120.00 | | | 212,120.00 | 100.0% | | 21,212.00 |
| | TOTAL | 1,312,699.74 | 1,312,699.24 | 0.00 | 0.00 | 1,312,899.24 | 100.0% | 0.00 | 109,519.10 |